UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re:<br><br>Michael A. Gral,<br><br>        Debtor. | Case No. 16-21329<br>Chapter 7 |

Donald A. Gral, *et al*.,

        Plaintiffs,

v.                                                      Adv. Pro. No. 17-02277-gmh

Michael A. Gral, *et al*.,

        Defendants.

## BRIEF IN SUPPORT OF MOTION TO DISMISS ALL COUNTERCLAIMS

## TABLE OF CONTENTS

I. PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. THE PLAUSIBILITY STANDARD FOR STATING A CLAIM . . . . . . . . . . . . . . 4

III. PLEADING FRAUD WITH PARTICULARITY . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV. THE FRAUDULENT TRANSFER COUNTERCLAIMS MUST BE
DISMISSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A. The Trustee's Counterclaims Are Not Time-Barred . . . . . . . . . . . . . . . . . . 8

    B. The Trustee Has Not Pled All of the Elements of a Fraudulent
       Transfer, and None of Them With the Required Particularity . . . . . . . . 9

V. THE CONSPIRACY COUNTERCLAIMS MUST BE DISMISSED . . . . . . . . . . . 11

    A. The Trustee Has Not Pled All Elements of Statutory Conspiracy . . . . . . . 11

    B. The Trustee's Conspiracy Claims Are Neither Plausible Nor Pled
       With the Required Particularity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

VI. THE VEIL-PIERCING COUNTERCLAIMS MUST BE DISMISSED . . . . . . . . . 16

VII. THE LEGAL MALPRACTICE COUNTERCLAIM MUST BE DISMISSED . . . . 19

    A. The Trustee Lacks Standing to Assert Malpractice By DJ . . . . . . . . . . . . . 19

    B. The Malpractice Claims Are Not Plausible. . . . . . . . . . . . . . . . . . . . . . . . . . 21

VIII. DISMISSAL OF ALL COUNTERCLAIMS SHOULD BE WITH PREJUDICE . . . 21

IX. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# I.  PROCEDURAL BACKGROUND.

Before Michael Gral ("Michael" or the "Debtor") sought bankruptcy protection in February 2016, one of his largest creditors ("Bielinski") had filed a lawsuit against his father ("Donald"), his brother ("DJ"), and numerous companies in which any of them held an ownership interest. Without objection, another equally large creditor ("SB1") intervened as a second plaintiff in that state court action (hereafter, the "Creditor Litigation").

The claims asserted by Bielinski and SB1 in the Creditor Litigation alleged that Donald, DJ and the defendant companies had received fraudulent transfers; that every one of the companies was Michael's alter ego to a degree that justified reverse veil-piercing; and that Donald and DJ had each conspired with Michael to defraud his creditors. The operative pleading in the Creditor Litigation is a "Second Amended Complaint," which has also been filed in the Debtor's main bankruptcy case as ECF No. 18-3. The Second Amended Complaint is a rambling 70-page document with an additional 90 pages of attachments. This Court has previously characterized it as "all a jumble." Main case, ECF No. 220, Audio Attach. at 29:45.

Once Michael filed his bankruptcy petition, the claims asserted in the Creditor Litigation became property of the bankruptcy estate. For the next 18 months, the underlying allegations of fraudulent transfers, alter ego, veil-piercing and conspiracy were repeated by Bielinski in numerous pleadings. They formed the subject of an unsuccessful Rule 9019 compromise motion brought by the Debtor, were investigated by an examiner, were treated in competing plans, and prevented a successful mediation of global issues in the case.

Finally, in September 2017 the plaintiffs filed this adversary proceeding to bring to a head the nagging claims that they were liable to the bankruptcy estate under any of the theories asserted by Bielinski and SB1. The plaintiffs seek declaratory judgments that none of them received any avoidable fraudulent transfers from Michael; that the LLC plaintiffs are not mere instrumentalities or alter egos of Michael; and that Donald and DJ did not conspire with Michael to defraud

1

his creditors.[1]  Recognizing that Michael, as a debtor in possession, was the wrong person to represent the bankruptcy estate in defending those claims, the plaintiffs immediately stipulated that the official committee of unsecured creditors (the "Committee") should fill that fiduciary role. The Court authorized the Committee to intervene and granted it derivative standing to proceed on behalf of the estate.  In October 2017, the Committee filed an answer and 154 paragraphs of counterclaim allegations.

Although counsel for the plaintiffs expressed a steady desire to push this action forward, nothing much happened before the Debtor's case was converted to Chapter 7 in March 2019. Steven McDonald was then appointed as trustee (the "Trustee") and has become the latest representative of the bankruptcy estate in this adversary proceeding.

The claims against plaintiffs are now in their *third* iteration:  (1) the Second Amended Complaint by Bielinski (adopted by SB1) in the Creditor Litigation; (2) the counterclaims filed by the Committee, which the Court has recently described as "vaporous," ECF No. 51 at p. 2; and (3) the superseding counterclaims just filed by the Trustee.[2]  Passage of time has not sharpened the focus of those claims.  Like successive generations of a feud, the animus continues undiluted but the justification keeps getting more nebulous and fumbling.

Later in this brief, we will address the inadequacy of the Trustee's allegations as to each of his counterclaims, in order.  But to set the stage, here's a summary:  The counterclaims all boil down to factual allegations that Donald and DJ helped Michael by either lending him money or giving him money or allowing him to receive disproportionate distributions or loans from entities

---

[1] Four of the plaintiffs also sought declarations that their claims against the estate are not subject to equitable subordination.  The economics of this case – in particular, the existence of sizeable Chapter 11 priority claims – make that issue moot as a practical matter.

[2] The overlap between the Trustee's counterclaims and the two earlier versions by Bielinski/SB1 and the Committee is summarized in the Affidavit of Mark L. Metz, submitted with this brief.  Fully 80% of the substantive paragraphs in the Trustee's counterclaims are lifted from the Second Amended Complaint in the Creditor Litigation, either verbatim or with minor changes such as substituting "Debtor" for "Michael A. Gral."

they co-owned with him. Although many legal doctrines are then invoked – fraudulent transfer, veil-piercing, conspiracy, legal malpractice – the Trustee never connects this familial support of Michael with harm to his creditors, other than *ipse dixit* statements. Over and over, the Trustee asserts that the act of "channeling" funds *to* the Debtor had the odd and counterintuitive effect of preventing him from paying creditors.

Consider, for example, paragraph 80 of the Trustee's counterclaims:

> Although Debtor draws a salary from [two companies, DJ] refuses to take a draw or salary from either entity. [DJ] does this expressly to aid Debtor to maintain his lifestyle to the detriment of the Estate or the Debtor's creditors.

To which a lawyer or logician replies "non sequitur," and a layman says "huh?" DJ owes money to Michael's creditors because DJ allowed himself to be underpaid in comparison to Michael?

Absent from the Trustee's counterclaims are more typical assertions, such as accusations that the Gral family helped the Debtor to transfer away his assets or secrete them beyond the reach of creditors.[3] To the contrary, the plaintiffs' purported wrongdoing is letting Michael have sources of revenue from which he paid his living expenses but not Bielinski or SB1; there's no accusation that the funds have been squirreled away somewhere. According to the Trustee – and before him, the Committee, and before that, Bielinski and SB1 – it was fraudulent and conspiratorial for the Debtor's father and brother to make financial accommodations to him, allowing him more money than he in some vague sense "deserved." But the mere belief that Donald and DJ alleviated Michael's distress does not give rise to a recognizable cause of action.

Sometimes, summarizing an opponent's claims is a device to mischaracterize them and then refute a straw-man version. Here, though, a preliminary summary was important to provide

---

[3] For a while – too long – the Debtor's creation of and transfers to a revocable living trust were touted as examples of his perfidy, and DJ's drafting of the trust document was labeled an act of conspiracy. But that trust *never* provided any protection against creditors, see Wis. Stat. §701.505(1)(a), and has been ignored for the entire 3+ years of this bankruptcy case. In the Trustee's counterclaims, the Michael A. Gral and Julia G. Gral Living Trust finally appears to have been retired from the "fraudulent transfer" and "conspiracy" discussion.

structure to counterclaims that are otherwise barely intelligible. We will proceed to show that none of the Trustee's counterclaims states a claim for relief under Fed.R.Civ.P. 8(a), as made applicable to this adversary proceeding by Bankruptcy Rule 7008. For good measure, we will demonstrate that the Trustee's counterclaims based on fraud also fall short of the more stringent standard for pleading set forth in Fed.R.Civ.P. 9(b), incorporated by Bankruptcy Rule 7009. In the end, we will explain why dismissal of the Trustee's counterclaims should be with prejudice.

## II. THE PLAUSIBILITY STANDARD FOR STATING A CLAIM.

There was a time when vague and conclusory allegations were enough to drag anyone into court and open the doors to discovery. In those days, the initial sufficiency of a complaint was measured by whether there was *any conceivable basis* under which the plaintiff *might* be entitled to some form of relief from the defendant. But in the federal courts, toleration of haphazard pleading ended in 2007 with the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed. 2d 929 (2007), followed by *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed. 2d 868 (2009).

*Twombly* involved a lengthy complaint alleging that the defendants had violated various provisions of the Sherman Antitrust Act. The *Twombly* Court retired the controversial rule from *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 550 U.S. at 563. Instead, in order to survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is *plausible on its face*." *Id*. at 570 (emphasis added).[4]

---

[4] The precedents we will cite all deal with the sufficiency of claims asserted by a plaintiff in a complaint. They apply equally to counterclaims, like the Trustee's. In this brief, we will continue to call the plaintiffs "the plaintiffs" rather than using the cumbersome term "counterclaim defendants."

4

Under this enhanced standard, conclusory allegations are no longer sufficient to satisfy threshold pleading requirements. A complaint that only offers labels and conclusions, or that formulaically recites the elements of a cause of action, will not suffice. *Id.* at 555. Accordingly, the plaintiffs' assertion in *Twombly* of an unlawful agreement was merely a "legal conclusion" and, as such, was not entitled to the assumption of truth. *Id.* at 556.

The *Twombly* Court next addressed the 'nub' of the plaintiffs' complaint – the well-pleaded, non-conclusory factual allegation of parallel behavior by the defendants – to determine whether it gave rise to a "plausible suggestion of conspiracy." *Id.,* at 565-66. Acknowledging that such parallel conduct was consistent with an unlawful agreement, the Court noted that there was also "an obvious alternative explanation" based on lawful and natural free-market behavior. *Id.,* at 567-68. Because the assumed-to-be-true allegation of parallel conduct was perfectly compatible with legal activity by the defendants, it did not *plausibly* suggest an unlawful agreement among them, so the plaintiffs' complaint failed to state a claim. *Id.,* at 570.

Two years later, in *Iqbal*, the Court clarified that the "plausibility standard" expounded in *Twombly* applies to all civil actions. *Iqbal*, 556 U.S. at 684. The *Iqbal* Court explained that two working principles underlie its decision in *Twombly*. First, legal conclusions are not covered by the tenet that a court must accept as true all of the allegations contained in a complaint. *Id*., at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Nor can a plaintiff avoid dismissal by carefully phrasing legal conclusions as though they were facts. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*

The second working principle from *Twombly* is that only a complaint that states a plausible claim for relief can survive a motion to dismiss. *Id.,* at 679. "Plausible" is not the same as "possible." Where the "well-pleaded facts do not permit the court to infer *more than the mere*

5

*possibility* of misconduct," the complaint has not shown that the pleader is entitled to relief.  *Id.* (emphasis added).  A complaint must go beyond raising the "sheer possibility that a defendant has acted unlawfully."  *Id.,* at 678.  If a plaintiff "pleads facts that are *merely consistent with* a defendant's liability," (*id*., emphasis added), the complaint remains stuck in the area of "well, it's possible" and never crosses the line into "plausibility of entitlement to relief."

So the two-step process used in *Twombly* and made explicit in *Iqbal* is (a) ignore legal conclusions, including those that are disguised as factual allegations, and (b) determine whether the defendant's actual (label-free) conduct plausibly (not just possibly) entitles the plaintiff to relief.  The second step involves analyzing whether that conduct suggests a reasonable inference of wrongdoing, or instead is merely <u>consistent with both unlawful and permissible</u> activity.

Finally, in both *Twombly* and *Iqbal*, the Supreme Court made it clear that plaintiffs may not dodge the plausibility standard by arguing that they will come up with real facts through the discovery process.  Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678-79.  Or as expressed by the *Twombly* Court, "a plaintiff with a largely groundless claim" should not be allowed to "take up the time of a number of other people" in order to extract settlement; instead "the basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558.

### III.  PLEADING FRAUD WITH PARTICULARITY.

The Trustee's first two counterclaims – for Fraudulent Transfer and for Conspiracy – are based in fraud.  They are therefore subject to the heightened pleading standard of Fed.R.Civ.P. 9(b), which provides:  "In all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with particularity."

For "well-nigh three decades," the Seventh Circuit has made clear that a party alleging fraud "must state particularly 'the who, what, when, where, and how' of the circumstances."

6

*Vexol, S.A. de C.V. v. Berry Plastics Corp.*, 882 F.3d 633, 637 (7th Cir. 2018), quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). See also *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 948 (7th Cir. 2013); *Borsellino v. Goldman Sachs Group, Inc*., 477 F.3d 502, 507 (7th Cir. 2007).

The particularity requirement of Rule 9(b) "is designed to discourage a 'sue first, ask questions later' philosophy." *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co*., 631 F.3d 436, 441 (7th Cir. 2011); see also *Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 748-49 (7th Cir. 2005) (particularity requirement "forces the plaintiff to conduct a careful pretrial investigation" and minimizes the risk of extortion that may come from a baseless fraud claim).

Plaintiffs are held to stricter pleading in the fraud context "in part because of the potential stigmatic injury that comes with alleging fraud and the concomitant desire to ensure that such fraught allegations are not lightly leveled." *Pirelli*, 631 F.3d at 442. In fraud cases, greater pre-complaint investigation is warranted "because public charges of fraud can do great harm to the reputation of a business firm" and because "fraud is frequently charged irresponsibly by people who have suffered a loss and want to find someone to blame for it." *Ackerman v. Northwestern Mutual Life Ins. Co*., 172 F.3d 467, 469 (7th Cir. 1999), citing *Bankers Trust Co. v. Old Republic Ins. Co*., 959 F.2d 677, 683 (7th Cir. 1992). Thus, Rule 9(b) requires the plaintiff to conduct a pre-complaint investigation "in sufficient depth to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate." *Ackerman*, 172 F.3d at 469.

Unfortunately, the protection against reputational assault theoretically offered by Rule 9(b) has been denied to Donald and DJ. For about five years, an elderly (now age 82) businessman and a respected lawyer have both been embarrassed by public allegations of fraud – beginning with the Second Amended Complaint in the Creditor Litigation, continued through Bielinski's

early pleadings in this Court, followed by the Committee's "vaporous" counterclaims, and now culminated in the Trustee's discovery-free replication of them. The allegations are not plausible, much less particular, but Rule 9(b)'s prophylactic purpose has largely failed in this case.

## IV. THE FRAUDULENT TRANSFER COUNTERCLAIMS MUST BE DISMISSED.

### A. The Trustee's Counterclaims Are Not Time-Barred.

Among the many bizarre aspects of the Trustee's amended answer is the "affirmative defense" that the bankruptcy estate's own fraudulent transfer counterclaims are time-barred by virtue of 11 U.S.C. §546(a). In a lawsuit where roles are already reversed, it's perhaps fitting that the potential beneficiary of a statute of limitations will now disclaim its applicability.

The ability of creditors to avoid fraudulent transfers pursuant to state law is extended to a bankruptcy trustee as part of the so-called "strong-arm powers" under §544(a). Section §546(a) limits a trustee's use of §544 and other avoidance powers to actions that are commenced before:

> . . . the earlier of —
>> (1) the later of —
>>> (A) 2 years after the entry of the order for relief; or
>>> (B) 1 year after the appointment or election of the first trustee . . . if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or
>> (2) the time the case is closed or dismissed.

11 U.S.C. §546(a).

In this case, that formula yields a deadline of February 20, 2018. It's true the Trustee wasn't involved back then and so did not file a fraudulent transfer counterclaim before that date. But the Committee was and did, under authority granted to it by this Court. Not very cogent counterclaims, but good enough to beat the §546(a) clock and earn relation-back status for any future amendments. Thus, if the Trustee can articulate viable counterclaims against any of the plaintiffs based on their receipt of fraudulent transfers, he still has time to do so.

8

## B. The Trustee Has Not Pled All of the Elements of a Fraudulent Transfer, and None of Them With the Required Particularity.

The most fundamental element of a fraudulent transfer is that there was a "transfer made . . . by a debtor." Wis. Stat. §242.04(1); Wis. Stat §242.05(1) and (2). So the first step is to find where in his counterclaims the Trustee factually alleges that Michael made a transfer. The closest allegations seem to be in paragraphs 74 through 77 which can be summarized as follows:

| PARA. | TRANSFERORS | TRANSFEREES | |
|-------|-------------|-------------|--|
| 74 | *Debtor*<br>Donald<br>18 Gral-entities | *DJ*<br>DJ<br>DJ | "From 2006 through 2013, [DJ] received . . ." |
| 75 | DJ<br>DJ<br>DJ | Debtor<br>Donald<br>18 Gral-entities | "From 2006 through 2013, [DJ] made . . ." |
| 76 | *Debtor*<br>DJ<br>18 Gral-entities | *Donald*<br>Donald<br>Donald | "From 2006 through 2013, [Donald] received . . ." |
| 77 | Donald<br>Donald<br>Donald | Debtor<br>DJ<br>18 Gral-entities | "From 2006 through 2013, [Donald] made . . ." |

Of the 78 unique combinations of transfers mentioned in ¶¶ 74 to 77, which could qualify as fraudulent transfers? Only the two in which the Debtor is identified as making the transfers.[5] So immediately, we can ignore the 76 combinations in which DJ or Donald made or received transfers to/from one another or the Gral-entities, although the question remains why the Trustee even included all of these extraneous allegations.[6]

Focusing, then, on transfers made *by the Debtor*, the next issue is what was transferred, and when? The best we can tell is that during an 8-year period, DJ received "hundreds of thousands

---

[5] Notably, these do not include any allegations that the Debtor ever transferred any money or assets to any of the Gral-entities.

[6] Likely answer: Because other than changing "Michael A. Gral" to "Debtor," the Trustee simply cut and pasted these allegations from ¶¶ 249, 250, 231 and 232 of Bielinski's Second Amended Complaint without independently evaluating their relevance to his counterclaims.

9

of dollars," of which some unstated portion came from Michael. And ditto for Donald. Without dates (when), amounts (what) or payment method (how), the fraudulent transfer allegations fall pitifully short of the particularity requirement of Rule 9(b). See, e.g., *Beyrer*, 722 F.3d at 949 (merely alleging six-month and four-month windows during which fraudulent acts occurred is not particular enough to satisfy the "when" factor under Rule 9(b)).

For now, though, let's pretend that Donald and DJ can tell precisely what transfers they allegedly received from Michael during 2006 to 2013 – perhaps by combing through the 98-page "expert report" the Trustee incorporates by reference. So what makes those transfers fraudulent?

In his heading for this counterclaim (but nowhere else), the Trustee cites Wis. Stat. §242.04 and Wis. Stat. §242.05. The first of those statutes has two parts. Section 242.04(1)(a) defines as fraudulent a transfer made by a debtor with "actual intent to hinder, delay or defraud any creditor." Nowhere does the Trustee allege that the transfers from Michael to Donald or DJ – in unspecified amounts on unknown dates – were made with such actual intent.

Under §242.04(1)(b), a transfer is "fraudulent" if (i) the debtor didn't receive reasonably equivalent value in exchange <u>and</u> (ii) was left with too few assets to carry out his business or pay his contemplated debts going forward. The Trustee makes a token reference to the first element, but inexplicably complains that Donald and DJ failed to provide reasonably equivalent value "to the Gral-entities," rather than to Michael as transferor. Counterclaims, ¶82. And the Trustee simply omits any allegation about the second element.

Continuing to guess under what theory any transfers were fraudulent with only a heading as guidance, we turn next to Wis. Stat. §242.05, which again describes two different versions of fraudulent transfers. Under §242.05(1), a transfer is fraudulent if the debtor (i) didn't receive reasonably equivalent value <u>and</u> (ii) was insolvent or was rendered insolvent by the transfer. Again, the Trustee's allegation with respect to the first element is misdirected (see Counterclaims, ¶82), and with respect to the second element (insolvency) is just plain missing.

Finally, §242.05(2) defines as fraudulent a transfer which, in bankruptcy parlance, is an insider preference – *i.e.*, made to an insider on account of an antecedent debt, while the debtor was insolvent. The Trustee does cover the insider element (Counterclaims, ¶81), but completely skips over the antecedent debt and insolvency requirements.

In sum, the Trustee's counterclaims for fraudulent transfers do not plead – indeed, do not even recite in a conclusory way that tracks the statute – each element of any of the four varieties of fraudulent transfers defined in Wis. Stat. §§242.04 and 242.05. He's missing actual intent, and unreasonably small remaining assets, and debts beyond the ability to pay, and insolvency, and antecedent debt. Those counterclaims must therefore be dismissed for failure to state a claim on which the Trustee and the estate are entitled to relief.

If neglecting to mention critical elements of a fraudulent transfer claim isn't fatal enough, there's this: Those elements to which the Trustee does allude – an unstated number of transfers by Michael to Donald or DJ in unspecified amounts on unknown dates during an 8-year period – are not pled with the requisite particularity mandated by Rule 9(b), which constitutes an independent grounds for dismissal of the fraudulent transfer counterclaims.

## V. THE CONSPIRACY COUNTERCLAIMS MUST BE DISMISSED.

### A. The Trustee Has Not Pled All Elements of Statutory Conspiracy.

The Trustee's second counterclaim is captioned "COUNT II – CONSPIRACY (WIS. STAT. CH. 134 AND COMMON LAW)." Like his fraudulent transfer counterclaims, the Trustee cites a statute in the heading and then never mentions it again. And what a statute! Chapter 134 is entitled "Miscellaneous Trade Regulations" and addresses wrongdoings as diverse as bribery of agents (§134.05), to issuing or using what is not money (§134.15), to misbranding of gold articles (§134.25).

Unguided by any reference to a specific *section* of Chapter 134, the plaintiffs are left to search. And although Chapter 134 contains more than 31,000 words, "conspire" only appears

twice (in §134.10 and §134.39) and "conspiracy" just once (in §134.99) – none of which seem remotely relevant to the Trustee's grievance.

Our best guess is that the Trustee meant to base his statutory conspiracy claim on §134.01, which reads:

> **Injury to business; restraint of will.** Any 2 or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of willfully or maliciously injuring another in his or her reputation, trade, business or profession by any means whatever . . . shall be punished by [up to a year in jail or a $500 fine].

Wis. Stat. §134.01

Although phrased as a criminal statute, Wisconsin courts have held that "a party may bring a civil action under [§134.01] to recover damages caused by its violation." *Brew City Redevelopment Group, LLC v. The Ferchill Group*, 289 Wis.2d 795, 816, 714 N.W.2d 582, 593 (Ct. App. 2006). *See also Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011) (interpreting and applying Wis. Stat. §134.01). The *sine qua non* of a conspiracy claim under §134.01 is <u>malice</u>, which means: "[D]oing a harm malevolently for the sake of the harm itself, and not merely as a means to some further end legitimately desired." *Brew City Redevelopment*, 289 Wis.2d at 817 (citation and internal quotes omitted). See also *Virnich*, 664 F.3d at 214 (only an irrational desire to cause harm for the sake of harm is actionable under §134.01).

Although the acts underlying a §134.01 claim must be pled with specificity, malice can be averred generally. *Brew City Redevelopment, id.,* citing *Onderdonk v. Lamb*, 79 Wis.2d 241, 248, 255 N.W.2d 507, 510 (1977) and Wis. Stat. §802.03(2), Wisconsin's counterpart to Rule 9(b). So really, the Trustee just needed to allege that Donald and DJ acted "maliciously." But he didn't. In fact, the words "malice" or "maliciously" never appear anywhere in the Trustee's counterclaims, nor do the companion words "willful" or "willfully." The omission appears to be deliberate, because the conspiracy counterclaims asserted by the Committee more than two years

ago *did* include allegations that Donald and DJ "acted maliciously." See ECF No. 8, ¶¶89–90. The Trustee has *dropped* those allegations from his reformulated conspiracy counterclaims.

Assuming the Trustee's counterclaim for statutory conspiracy is based on §134.01 – and not all of Wis. Stat. Ch. 134, as the heading would suggest – it must be dismissed for failure to allege that Donald or DJ acted maliciously, without which there is no claim ("*sina qua non*").

### B. The Trustee's Conspiracy Claims Are Neither Plausible Nor Pled With the Required Particularity.

The Trustee also asserts a counterclaim for conspiracy based on common law. In Wisconsin, this doctrine appears to predate §134.01, and the elements of a claim differ slightly from the statutory version. They are summarized as follows:

> In Wisconsin civil conspiracy has been defined as a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not in itself unlawful. *Mendelson v. Blatz Brewing Co.* (1960), 9 Wis2d 487, 490, 101 N.W.2d 805. The law of civil conspiracy is further characterized in this state by the following:
>
> "It is the established law of this state that there is no such thing as a civil action for conspiracy. There is an action for damages caused by acts pursuant to a conspiracy but none for the conspiracy alone. In a civil action for damages for an executed conspiracy, the gist of the action is the damages." *Singer v. Singer* (1944), 245 Wis. 191, 195 14 N.W.2d 43.

*Onderdonk v. Lamb*, 79 Wis.2d 241, 246, 255 N.W.2d 507, 509 (1977).

To state a cause of action for civil conspiracy, the complaint must allege: "(1) The formation and operation of the conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting from such act or acts. . . . The complaint must state what was done in the execution of the conspiracy and that the purpose of the combination was accomplished." *Onderdonk*, 79 Wis.2d at 247 (citations omitted).

For purposes of the current motion to dismiss, the Trustee's allegations of civil conspiracy will first be tested against the plausibility standard. Then, because the alleged conspiracy

13

was one to defraud Michael's creditors, we will also apply the more stringent "plead fraud with particularity" requirements of Rule 9(b).

As noted, *Twombly* and *Iqbal* instruct trial courts to disregard legal conclusions, as well as "threadbare recitals of the elements of a cause of action." *Twombly*, 550 U.S. at 558; *Iqbal*, 556 U.S. at 678. They also warn that plaintiffs may not avoid dismissal by pleading legal conclusions that are "couched as" factual allegations. *Id*. In these two landmark cases, the Supreme Court provided helpful examples of allegations that are *not* entitled to the presumption of truth when considering a motion to dismiss.

Those examples include allegations that a defendant entered into an "unlawful agreement"; that a defendant "conspired"; that a defendant "knew of, condoned and willfully and maliciously agreed to [another's improper conduct]"; and that a defendant was "the principal architect" of a scheme, or was "instrumental" in adopting and executing it. *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 680-81. While each of those allegations can be phrased as a "fact" – *i.e.*, can be presented in a declarative sentence stating that the defendant did something – they are really just conclusory recitals of the elements of a legal claim, with the defendant's name inserted as the actor.

Note how similar those not-presumed-true allegations flagged by the Supreme Court are to the Trustee's conclusory averments in his conspiracy counterclaims, ¶¶84 to 86. In each of those paragraphs, the Trustee repeats the words "acted with an unlawful purpose . . . in carrying out their common purpose of a conspiracy to defraud . . . Debtor's creditors." *Twombly* and *Iqbal* tell us to ignore or erase these conclusory recitals of the elements of conspiracy, and see what is still left by way of real factual allegations.

That exercise is revealing. Stripped of legal conclusions and labels, here's what remains as the "facts" which supposedly constituted a civil conspiracy:

14

- Donald and D.J. helped and advised Michael (and Donald) to "channel" distributions from the Gral-entities to Michael and his trust.

- Donald and D.J. permitted and approved of Michael solely controlling distributions and payments of salaries.

- Donald and D.J. planned for, drafted, settled and transferred assets to Michael and his trust.

That's it. And if we consolidate two sets of related verbs – (helped, advised, permitted, approved, planned, drafted) and (channeled, settled, transferred) – we understand that the Trustee's only <u>factual</u> allegation is that Donald and DJ let Michael have money from the Gral-entities. Under *Twombly* and *Iqbal,* that is the one and only statement about historical events (*i.e.*, <u>facts</u>) which must be accepted as true for purposes of this motion to dismiss.

The next step is to determine whether the well-pleaded fact – *i.e.*, that Donald and DJ let Michael have money from the Gral-entities – plausibly states a claim for conspiracy to defraud Michael's creditors. In both *Twombly* and *Iqbal,* there were two different explanations for the defendants' factually-pled, label-free conduct – the "obvious alternative" in which those activities were neutral and legal, and the "illicit" or "invidious" version flowing from inferences urged by the plaintiffs. Both explanations were *possible*, but the second version did not state a claim to relief that was facially *plausible.*

Here, the "fact" that Donald and DJ let Michael have money from the Gral-entities has several explanations that are more obvious and natural than a sinister plan to defraud Bielinski, SB1 and other creditors. It wouldn't be the first time that family members were motivated by love or loyalty or affection to provide financial support to a struggling son or brother. Yet the Trustee – like the Committee before him, and Bielinski before that – theorizes that Donald and DJ subordinated their own interests in salary and/or distributions and let Michael receive extra <u>for the specific purpose of harming</u> Michael's creditors. Not only is the motive illogical ("Let's

15

hurt ourselves in order to hurt Bielinski and SB1"), but the plan itself is pretty stupid, since making funds available to someone does not usually damage his creditors.

Facing different possible inferences from the defendants' conduct in *Twombly* and *Iqbal*, the Supreme Court credited the commonplace over the complex, the lawful over the awful. When that process is applied here – when this Court considers the potential inferences to be drawn from the well-pleaded fact that Donald and DJ let Michael have money from the Gral-entities – the Trustee's counterclaim for conspiracy is implausible and therefore fails to state a claim under Rule 8.

As mentioned, the Trustee's conspiracy counterclaims are fraud-based, and therefore his allegations supporting them must be pled with particularity under Rule 9(b). The fact that those claims fall short of the *plausibility* standard means they necessarily flunk the particularity requirement as well. Instead of belaboring the analysis, we will simply point out that the Trustee makes no allegations concerning when or where the conspiracy was created, which conspirators agreed to do which acts, or any conspiracy-furthering events that occurred in historical time other than letting Michael receive money from the Gral-entities.

## VI. THE VEIL-PIERCING COUNTERCLAIMS MUST BE DISMISSED.

Between paragraphs 11 and 64 of his counterclaims, the Trustee identifies the ownership of most of the Gral-entities and makes a series of allegations about who controls three or four functions at each company – *i.e.*, receiving contributions or loans; making distributions or loans; bookkeeping and day-to-day accounting; and, for some companies, selling or buying real estate. Every single allegation concerning control is presented "Upon information and belief." The following chart summarizes the Trustee's control allegations:

16

| Para. | Companies | "Upon information and belief," who controls . . . | | | |
|---|---|---|---|---|---|
| | | Contributions, Loans In | Distributions, Loans Out | Bookkeep, Daily Accting | Purchase/Sell Real Property |
| 14-17 | Integral LLC Integral Investments | Michael | Michael | Michael | Michael |
| 22-24 | Integral Medical Glendale Medical Ctr | Michael and/or DJ | Michael and/or DJ | Michael | N.A. |
| 34-36 | Integral Services Integral Management | Michael | Michael | Michael | Michael |
| 40-42 | LDG Investments | Michael, DJ and/or Donald | Michael, DJ and/or Donald | Michael | N.A. |
| 48-51 | Prospect Ave. Holdings GG 3939 | Not covered* | Michael, DJ and/or Donald | Michael | Michael, DJ and/or Donald |
| 56-58 | Gallagher Gral | Michael | Michael | Michael | N.A. |
| 62-64 | Gral Investment Co. | Not covered* | Michael, DJ and/or Donald | Michael | N.A. |

*Because the Trustee accidentally duplicates in consecutive paragraphs his allegations regarding control over making distributions and loans -- a mistake also found in Bielinski's Second Amended Complaint.

Without exception, Michael is alleged to be in control of the bookkeeping and day-to-day accounting for every Gral-entity. But notice that for 6 of the 11 specified entities, Michael may not have any control over the contributions, distributions or loans. According to the Trustee's own averments, Michael at least shares that authority with DJ and Donald, while the "and/or" qualifier also means those functions could be entirely controlled by DJ alone or Donald alone.

Later, in his counterclaim entitled COUNT III – PIERCE THE CORPORATE VEIL, the Trustee abandons the company-by-company distinctions, lumps all of the Gral-entities together, and alleges that Michael alone exercises "domination and control" over their finances, day-to-day operations, policies, distributions, draws, loans, etc. See Counterclaims, ¶¶89-92. These absolutist allegations contradict the many instances of shared control acknowledged by the Trustee in earlier paragraphs.

But even the Trustee's most sweeping accusations regarding the Debtor's "domination and control" of the Gral-entities are always accompanied by the caveat that Michael's actions are

taken with the "permission and acquiescence" of Donald and DJ. That concession negates the Trustee's theory that the Gral-entities (all of them, lumped and undifferentiated) are Michael's alter egos and instrumentalities, without existence separate or independent from Michael.

We return to the "plausibility" analysis prescribed in *Twombly* and *Iqbal*. As before, the first step is to identify all conclusory statements and labels-disguised-as-facts, and then ignore them so the real factual allegations can be examined. As applied to the Trustee's veil-piercing counterclaim, this means that legal conclusions like "domination" and "instrumentality" and "no separate existence" are set aside.

What's left are factual allegations, assumed to be true, that (a) DJ and Donald allowed Michael to make all of the decisions for some of the Gral-entities, (b) DJ and Donald retained at least shared decisional authority in other Gral-entities, and (c) DJ and Donald let Michael do the bookkeeping and day-to-day accounting for all Gral-entities.

The next step is to ask whether those assumed-true facts plausibly support the Trustee's inference that all of the Gral-entities have lost their independent existence and become nothing more than Michael's alter egos, "for the purpose of avoiding [his] bona fide obligations to the Estate and [his] creditors." Counterclaims, ¶92. Or is there a more natural and commonplace explanation for these facts?

And again, stripped of the Trustee's conclusory labels, the Gral-entities' control arrangements appear quite mundane. They could easily be interpreted as normal delegations of functions and authority among members of closely held companies. Or they could be part of a complex and devilish scheme to ensure that Michael's creditors never see a dime. According to *Twombly* and *Iqbal*, the "obvious alternative," in which the Grals' activities are neutral and legal, renders implausible the "illicit" or "invidious" version promoted by the Trustee.

18

# VII.  THE LEGAL MALPRACTICE COUNTERCLAIMS MUST BE DISMISSED.

## A.  The Trustee Lacks Standing to Assert Malpractice By DJ.

The Trustee's first three counterclaims (fraudulent transfers, conspiracy and veil-piercing) tediously mimic those of the Committee and, especially, the Second Amended Complaint filed by Bielinski in the Creditor Litigation.  But to show he adds value, the Trustee offers one fresh theory of recovery:  COUNT IV – LEGAL MALPRACTICE.  If possible, the Trustee's special contribution is even feebler than his predecessors'.  It goes like this:

- DJ is a lawyer.

- "At all material times," he acted as an attorney for Michael, Donald, all of the Gral-entities and himself.

- DJ owed the Gral-entities a "duty of care and loyalty" to advise them that Michael's activities could cause them to become insolvent and unable to pay their own creditors.

- DJ failed to prevent Michael (and Donald and himself) from harming the Gral-entities, thereby breaching his duties to the Gral-entities.

- As a result, Michael's creditors – and the bankruptcy estate – were harmed.

Under Wisconsin law an attorney cannot be held liable to a non-client for professional negligence, with one exception that's inapplicable to this situation.  This is not a gray area.  The rule that "only an attorney's clients may normally sue that attorney for malpractice" is so time-honored and so recently reaffirmed that the Trustee's fourth counterclaim would be sanctionable if plaintiffs had the time to provide a Rule 11 safe-harbor notice.

To understand the history of this rule, the policies behind it, and the single exception, one need only read a decision issued by the Wisconsin Supreme Court a mere six months ago:  *MacLeish v. Boardman & Clark LLP*, 924 N.W.2d 799, 2019 WI 31.  The appellants in *MacLeish* complained that by failing to establish a trust, their father's lawyer had cost them more than

$250,000 in estate taxes. The trial court dismissed their claim based on a lack of standing, and the court of appeals affirmed.

The *MacLeish* Court began its analysis by restating and explaining the general rule in Wisconsin:

> Generally, an attorney cannot be held liable to a third party for any act committed within the scope of the attorney-client relationship. *Yorgan v. Durkin,* 2006 WI 60, ¶27, 290 Wis.2d 671, 715 N.W.2d 160; *Green Spring Farms v. Kersten,* 136 Wis.2d 304, 321, 401 N.W.2d 816 (1987). Stated differently, "only an attorney's clients may normally sue that attorney for malpractice." *Beauchamp v. Kemmeter,* 2001 WI App 5, ¶7, 240 Wis.2d 733, 625 N.W.2d 297.
>
> This rule serves to protect the attorney-client relationship. To extend an attorney's liability to third parties not in privity with the attorney may create damaging effects on the defendant attorney's relationship with the client. *Green Spring Farms,* 136 Wis.2d at 329, 401 N.W.2d 816. "That is, if an attorney must be responsible not only to his or her own client but also to a third-party nonclient, a potential conflict of interest may be inevitable, thus impairing an attorney's ethical obligations to represent his or her own client zealously within the bounds of the law." *Id.*

*MacLeish*, 2019 WI 31, ¶¶26-27.

The Court then turned to the exception that it had created 36 years earlier in *Auric v. Continental Casualty Co.*, 111 Wis.2d 507, 331 N.W.2d 325 (1983). Under *Auric*, "the beneficiary of a will may maintain an action against an attorney who negligently drafted or supervised the execution of the will even though the beneficiary is not in privity with that attorney." *MacLeish*, 2019 WI 31, ¶30.

The *Auric* exemption is a narrow one. The *MacLeish* Court declined to expand it to cover the appellants' situation, and refused to adopt §51 of the Restatement (Third) of the Law Governing Lawyers, which lists additional circumstances under which an attorney owes a duty of care to non-clients.

For more than half a century, Wisconsin has followed the general rule that non-clients lack standing to sue an attorney for professional negligence. The state's commitment to that position was tested and confirmed just six months ago (in fact, about a week after the Trustee

was appointed in this case). Accordingly, the Trustee has no standing to assert on behalf of the bankruptcy estate that DJ failed to fulfill a duty of care owed to the Gral-entities as their lawyer.

## B. The Malpractice Claims Are Not Plausible.

Beyond peradventure, Wisconsin law bars the Trustee from pursuing a legal malpractice claim against DJ. So what could possibly prompt a lawyer to file a claim that is solidly blocked by controlling law? Sadly, the existence of malpractice insurance: the Trustee had a choice to follow the merits or the money, and opted for the latter.

Based on that tactic, the plaintiffs anticipate the Trustee might try to reach the only deep pocket in another way – namely, by arguing that DJ committed professional negligence in his representation of Michael, and the bankruptcy estate succeeds to Michael's malpractice claim. But that's not even close to what the Trustee has alleged, and the sketchy averments in ¶¶95 to 98 cannot be interpreted as plausibly asserting such a claim.

Again, the legal malpractice counterclaim is premised on DJ's purported "duty of care and loyalty to the Gral-entities" (¶97), and on allegations that he "breached his duties to the Gral-entities" (¶98). Although Michael is also listed in ¶96 as one of DJ's clients (When and for what legal matters?), he is portrayed as a malefactor – he's the cause of DJ's alleged negligence rather than a victim of it. The Trustee does not allege that DJ breached a duty of care owed to Michael as a client, nor would such an averment be compatible with the rest of the legal malpractice counterclaim, in which DJ's purported shortcoming was his failure to protect the Gral-entities from Michael's depredations.

Even if the Trustee had standing to assert some subset of malpractice claims against DJ, he has failed to plead them coherently, much less plausibly as required by *Twombly* and *Iqbal*.

## VIII. THE DISMISSAL OF ALL COUNTERCLAIMS SHOULD BE WITH PREJUDICE.

As shown above, none of the Trustee's counterclaims manages to state a claim for relief under the plausibility standard enunciated in *Twombly* and *Iqbal*. For some claims (fraudulent

21

transfers, statutory conspiracy), the Trustee has omitted any reference whatsoever to one or more required elements.  Other claims are pled in a conclusory fashion that is impermissible.  Two of the counterclaims are based in fraud and needed to be pled with particularity, but the Trustee alleged almost no specific facts relating to the "who, what, when, where, and how."  One of the Trustee's counterclaims (legal malpractice) must be dismissed for lack of standing under well-settled and controlling law.

The remaining question is whether dismissal of the Trustee's counterclaims should be with prejudice.  For reasons already familiar to the Court, the answer is a resounding "YES."

Between Bielinski, the Committee and the Trustee, three different parties – each represented by experienced and sophisticated litigation lawyers – have taken a crack at articulating some set of facts and some legal theory that would render at least one of the 20 current plaintiffs liable to Michael's creditors or the bankruptcy estate.  Although each successive attempt has produced a shorter pleading, the claims themselves have never advanced past the line of "possible" into the realm of plausible.

Given the amount of attention, discovery, research, fees and judicial resources spent so far, the Court can reasonably conclude that more time or additional amendments are unlikely to produce better-pled claims.  Furthermore, the Court explicitly instructed the Trustee that any counterclaims he chose to file would need to "plead non-conclusory facts demonstrating that each alleged counterclaim is plausible."  ECF No. 51, p. 3.  That warning was ignored.

The Seventh Circuit's decision in *Airborne Beepers v. AT&T Mobility LLC*, 499 F.3d 663 (7th Cir. 2007) is instructive.  The appellant was challenging only the district court's denial of permission to file a fourth amended complaint after dismissal of the third.  *Id.* at 666.  The Court of Appeals first quoted Fed.R.Civ.P. 15(a) for the proposition that "leave [to amend a pleading] shall be freely given when justice so requires."  But there are good reasons to deny amendment,

including "undue delay . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party [and] futility of amendment." *Id*., quoting *Forman v. Davis*, 371 U.S. 178, 182 (1962).

The *Airborne Beepers* Court emphasized that the trial judge had provided guidance to the appellant about how to remedy deficiencies in its complaint, and concluded that the "failure to fix those shortcomings provides ample grounds for dismissal." *Id*. In addition, the Court found that appellants' "poorly drafted complaints caused substantial delay and prejudice to its adversary." Together, these factors justified the district court's decision to deny "one more round of pleadings." *Id.* at 667.

The situation here is similar. Although the Trustee has only filed one set of defective counterclaims, he was forewarned that this Court would require something more substantial and clear than the "vaporous" counterclaims filed by the Committee as predecessor representative of the bankruptcy estate. The Trustee disregarded that warning and filed the same old fact-light, conclusory allegations as before – lifting 80% of his text directly from Bielinski's discredited Second Amended Complaint, and adding only a new dead-on-arrival claim for legal malpractice.

The plaintiffs have been put through enough. After five years, the claims against them still have not been pled in a plausible way. As Judge Easterbrook announced in another case upholding dismissal of a complaint with prejudice: "[I]n court, as in baseball, three strikes and you're out." *Bank of America v. Knight*, 725 F3d 815, 819 (7th Cir. 2013).

## IX  CONCLUSION.

For all of the foregoing reasons, the Court should enter an order dismissing the Trustee's counterclaims with prejudice.

23

Dated this 29th day of October, 2019.

Stafford Rosenbaum LLP
1200 N. Mayfair Rd., Suite 430
Milwaukee, WI 53226
414-982-2867 (direct)
sallen@staffordlaw.com

/s/ *Susan K. Allen*
Susan K. Allen, Attorneys for Donald J. Gral

Leverson Lucey & Metz S.C.
3030 W. Highland Blvd.
Milwaukee, WI 53208
414-271-8502 (direct)
mlm@levmetz.com

/s/ *Mark L. Metz*
Mark L. Metz, Attorneys for all plaintiffs
  other than Donald J. Gral